UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

DIEGO J. HERBSTEIN,                        :        08 CV 0528 (LBS)
                                           :        ECF CASE
                          Plaintiff,       :
                                           :        COMPLAINT
             -against-                     :
                                           :
EDUARDO HERBSTEIN and                      :        PLAINTIFF DEMANDS
GUILLERMO HERBSTEIN,                       :        TRIAL BY JURY
                                           :
                          Defendants.      :
                                           :
-------------------------------------------------------------x

       Plaintiff Diego J. Herbstein, by his attorneys DePetris & Bachrach, LLP, for his complaint alleges the following:

       1.  This is an action in which plaintiff Diego J. Herbstein seeks damages arising from fraud and a pattern of racketeering activity committed by defendants Eduardo Herbstein and Guillermo Herbstein, residents of Argentina, with respect to the interest of David Herbstein (defendants' late father) in certain real estate investments made by the Herbstein family in the United States.  The investments at issue were effectively managed by plaintiff.

       2.  As more particularly set forth below, David Herbstein invested $130,585 in late 1977; he had received payments on his investment totalling about $266,000 as of November 1985; he received an additional payment of about $104,000 in early 1987 from distributions that had been held in escrow pending resolution of certain disputes among the family investors; and during the ensuing years additional payments were made to David Herbstein or, after his death in 1991, to his heirs for his interest.  Nevertheless, subsequent to the death of their father and mother and despite the substantial profits made on the investment, defendants devised a scheme to defraud and to obtain money and property from plaintiff with respect to

the interest of their late father in the real estate investments.

3.   The gravamen of defendants' scheme was the fraudulent claim that no payment had ever been made to David Herbstein on his investment, and the fraudulent allegation that no report or accounting had ever been made to David Herbstein with respect to his investment. As detailed below, during the period beginning in or about March 2004 and continuing to date, defendants have engaged in a scheme to defraud and to obtain money and property from plaintiff by means of the fraudulent claim and the fraudulent conduct of litigation in the courts of the State of New York, thereby causing plaintiff to incur substantial attorneys' fees and expenses in defending against and in preventing and minimizing damages from the fraud.

JURISDICTION

4.   This Court has subject matter jurisdiction pursuant to the following statutes and bases: 1) 28 U.S.C. §1332, in that there is diversity of citizenship between plaintiff and each of the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs, as set forth herein; 2) 28 U.S.C. §1331 and 18 U.S.C. §1964(c); and (3) 28 U.S.C. §1367.

THE PARTIES

5.   Plaintiff Diego J. Herbstein (hereinafter "plaintiff" or "Diego") is a citizen of Argentina admitted to the United States for permanent residence, and is domiciled in and a citizen of the State of New York.  Plaintiff moved to the United States in or about 1970 and is a neurologist in private practice in New York.

6.   Defendants Eduardo Herbstein and Guillermo Herbstein (hereinafter "defendants" or "Eduardo" and "Guillermo") are citizens of and reside in Argentina.  Defendants are sons of the late David Herbstein, who was plaintiff's uncle.

2

FACTUAL BACKGROUND

7.   The dispute underlying this action stems from investments made in the late 1970's by plaintiff's father, Julio Herbstein (hereinafter "Julio"); Julio's brother (and defendants' father), David Herbstein (hereinafter "David"); and plaintiff's father-in-law at the time, Lazaro Freidenberg (hereinafter "Lazaro"). One of Lazaro's daughters, Judith Freidenberg, married plaintiff in 1968, but they separated in or about 1983 and divorced in or about 1985.

8.   The initial investment by the three shareholders (Julio, David and Lazaro) was in Great Southern Investment, a Panamanian corporation. Shortly thereafter, a new investment company, Great Southern Realty, a Curacao corporation, was formed with the same three shareholders, plus Salomon Lijtmaer (the husband of Julio and David's sister, Berta Lijtmaer). In or about September 1981, these four shareholders formed Solange Realty Corp. ("Solange"), a New York corporation, which served as a vehicle for certain real estate investments made by the Herbstein family in the United States.

9.   Plaintiff served as the President of Solange and effectively managed Solange's investments. James Goldstein, Esq. ("Goldstein") served as Secretary and later as escrow agent for Solange. In a memorandum to Lazaro, David and Julio dated November 22, 1985, Goldstein summarized the relevant investment history, including the formation of the investment companies, the interests and changes in interest of the shareholders, the dissolution of the group in the mid-1980's (except for Solange's remaining investment in Broadway Developers Associates), and the payments made to David and Lazaro as of that time. (A copy of that memorandum is annexed hereto as Exhibit A.)

10.   Goldstein was actively involved in the administration of Solange during a significant period in the mid-1980's. Another of Lazaro's daughters, Elizabeth Freidenberg (hereinafter

"Elizabeth"), was an attorney in Argentina, and she represented David and Lazaro in connection with their interests in Solange during the aforesaid period in the mid-1980's.  As shown below, the reports and events in the mid-1980's involving Goldstein, Elizabeth, David and Lazaro show that contrary to defendants' fraudulent claim that their father never received any return or payment whatsoever on his investment, by 1987 David had been paid approximately $370,000 and had already made a substantial profit on his investment.

A.  The Reports and Accounting of Payments Made to David as of November 1985

11.  In addition to summarizing the history of the investments during the period from 1977 to 1985, the memorandum dated November 22, 1985 from Goldstein to David and Lazaro set forth the amounts of the payments made to them, the time period when the payments were made, and the reason for the payments; and reported on the only remaining investment of the group as of November 1985 (Solange's investment in Broadway Developers Associates through Diego Herbstein Associates, which involved a co-op conversion of property at 2420 Broadway).  (Exhibit A.)

12.  The memorandum reported the following information with respect to the time period, amounts and reasons for the payments to  David (Ex. A, at p. 2):

| July 1979 | | $120,000 | Sale of Part of David Herbstein's Interest in GSR and GSI |
|---|---|---|---|
| | | | |
| April 1984 | $ 70,588.56 | | Liquidation or Sale of |
| June 1984 | $  7,843.16 | | All of David Herbstein's |
| June 1984 | $ 28,548.00 | | Interest in Herbstein Family |
| February 1985 | $ 27,229.26 | | Investments (Except for |
| March 1985 | $ 11,740.10 | | Property Known as 2420 Broadway) |
| | $145,949.08 | | |
| | $265,949.08 | | |

The memorandum also reported on payments made to Lazaro in April 1984, June 1984,

4

February 1985 and March 1985 for the liquidation and sale of Lazaro's interest in the investments, and on other minor distributions made to the shareholders in 1984.  (Ex. A, at pp. 2-3.)

13.  The amount invested by David was $130,585 (the funds invested in Solange came from David's initial investment).  (Ex. A, at p. 1.)  Thus, as of the time of Goldstein's memorandum, David had already received payments that amounted to more than double the amount of his investment.  In sum, as of November 1985, not only had David recouped the amount of his investment, but also he had received a profit in excess of $135,000.

14.  By letter dated December 16, 1985 David acknowledged in writing that he received this memorandum from Goldstein, the Secretary and escrow agent for Solange.  Prior thereto, in November 1984, David and Lazaro – through the Argentine attorney Elizabeth – had expressed their confidence in Goldstein by stating that he should take whatever action he deemed appropriate in connection with Solange and, when in doubt, he (Goldstein) was authorized by them to act in accordance with instructions from Elizabeth.  Goldstein requested that he be provided with written authorization from David and Lazaro in that regard.  By letter dated and signed on January 4, 1985, as stockholders of Solange, David and Lazaro provided written authorization to Goldstein as follows:

> "you can rely upon the advice of E. Freidenberg for any action which needs to be taken, by Solange.  It is our agreement that you can take any action that you feel appropriate and when in doubt, you will be absolved from any responsibility if you act in accordance with E. Freidenberg's instructions."

15.  Thereafter, Goldstein had many conversations and communications with Elizabeth concerning Solange and matters relating to David and Lazaro's interests therein.  Goldstein also provided reports to Elizabeth with respect to the transactions involving the above-stated

payments to David and Lazaro in February and March 1985.

16.  The payments to David and Lazaro in February and March 1985 were made by checks to them drawn on Townsville N.V. (hereinafter "Townsville"), after Townsville had received distributions from Solange.  David and Lazaro and other family members who were shareholders in Solange were also the shareholders of Townsville, a Curacao corporation, and they had the same percentage ownership interest in Townsville as in Solange.  Rather than investing funds directly in Solange, the investors' funds were transferred to Townsville, which then loaned monies to Solange for investments in the United States.  When distributions from the investments were made to Solange, monies available for distribution from Solange were paid to Townsville as repayments of the loans, with interest.  This benefitted the individual foreign shareholders, including David, who as a result were not then subject to withholding taxes that would otherwise have been applicable to income from real estate investments in the United States allocable to a foreign investor.  The tax advantages of Solange's debt to Townsville were specifically discussed in a memorandum from plaintiff to David and Lazaro that supplemented Goldstein's November 1985 memorandum to them, and in a letter dated October 29, 1986 from Goldstein to Elizabeth, with copies to the shareholders.

17.  Neither David – nor Elizabeth or anybody else acting on David's behalf – ever disputed the fact that the payments to David as reported in Goldstein's November 1985 memorandum were made, and that the only remaining investment of the group was Solange's investment in the above-referenced co-op conversion of property.

B.  The Escrow Account for Solange, Distributions Therefrom, and the Additional Payment to David from Townsville

18.  In accordance with an agreement between Goldstein, Elizabeth (on behalf of David

6

and Lazaro) and Diego in November 1985, Goldstein agreed to serve as escrow agent for

Solange and placed monies received for Solange's remaining investment in a separate

interest-bearing escrow account.  In December 1985, the law firm of Solin & Breindel advised

Goldstein in writing that it had been retained to serve as New York counsel for David and

Lazaro in connection with the subject matters in dispute.

19.  By letter to Elizabeth dated October 29, 1986, with copies to Solange's

shareholders, Goldstein summarized the principal points of a telephone conversation he had

with Elizabeth, including the fact that certain matters in dispute had not yet been resolved and

that he had not yet received any part of the $40,000 commission due and owing to him for the

work he had performed on behalf of Solange and its investors.  At that time, the amounts

distributed to the escrow account for Solange, together with interest earned thereon,

amounted to approximately $700,000.  Goldstein proposed the following solution:

> As a result, unless the disputes between the parties are
> resolved promptly and authorization is given me by the majority of
> the shareholders and Diego Herbstein to pay myself my $40,000
> commission, I told you I will take the entire proceeds (almost
> $700,000) and pay them into federal court in connection with a
> federal interpleader action I will initiate.  I will list all the parties who
> may have an interest in the monies ....
>     All the shareholders will be served as well as Solange and
> Townsville and Diego Herbstein.  Everyone can present their own
> claims to the money which will be paid out in accordance with the
> Court's order after the litigation is concluded.

20.  Since David and his authorized representatives (Elizabeth and Solin & Breindel) did

not dispute the accounting of payments received by David, they did not pursue the opportunity

to make claims for said payments against the Solange escrow account.  Instead, by written

authorization dated November 28, 1986, plaintiff and counsel for David and Lazaro authorized

Goldstein in writing to release the funds from the escrow account.  The authorization on behalf

7

of David and Lazaro was provided in writing by their New York counsel, Solin & Breindel, "acting with due authorization on behalf of Elizabeth Mireya Freidenberg, David Herbstein & Lazaro Freidenberg," and expressly authorized the release of funds held in escrow by two checks dated November 28, 1986 drawn on Goldstein's escrow accounts payable to Solange: one in the amount of $602,581.57 and the other in the amount of $100,201.37.  Solange's Secretary Goldstein and its President Diego then issued two checks dated November 28, 1986 drawn on Solange's account: one check in the amount of $655,924.45 payable to Townsville ($10,000 of which was needed for certain expenses, the remainder being available for distribution to Townsville shareholders), and the other check in the amount of $40,000 payable to Goldstein's firm for his commission.

21.  A month later, the resolution of the disputes had still not been reduced to writing. Pursuant to a verbal understanding between Goldstein, counsel for David and Lazaro, and counsel for Diego, Goldstein agreed to receive funds from Townsville and hold the same in escrow, without interest, pending further instructions.  Goldstein received a check dated December 23, 1986 from Townsville in the amount of $645,924.45, and in early January deposited the check in his escrow account.

22.  In or about March 1987 the funds were released from Goldstein's escrow account to Townsville (written authorization to do so was provided by counsel for Diego and counsel for David and Lazaro) and payments were made of amounts due to Townsville shareholders, including an amount for David of about $104,000.  As with respect to the payments to David in the approximate amount of $266,000 reported in Goldstein's November 1985 memorandum, neither David – nor Elizabeth or Solin & Breindel (David's representatives regarding his interest in Solange and the escrow accounts) – ever disputed the fact that this payment of

8

about $104,000 was received by David in or about March 1987.  In sum, by early 1987 David had received payments totalling approximately $370,000, and had made a profit on his investment of almost $240,000.

C.  The Memorialization of the Settlement of the Herbstein Family Investors' Dispute

23.  In January 1987 a proposed written settlement agreement was prepared for the purpose of memorializing the oral agreement reached in late November 1986 by the Herbstein family investors: Julio, David, Lazaro, Berta Lijtmaer (Julio and David's sister and widow of Solomon Lijtmaer, who was a shareholder in Solange; hereinafter "Berta"), and Diego.  The draft written agreement was submitted by counsel for Diego to Solin & Breindel, counsel for David and Lazaro. Thereafter, minor language changes were made to the draft, and a final written settlement agreement was distributed for review and signature.  Solin & Breindel, as well as Elizabeth, approved the written settlement agreement on behalf of David and Lazaro. The written settlement agreement was executed by Julio, Berta and Diego in late January or early February 1987.  During that same time period, pursuant to the assurances of Elizabeth that the written settlement agreement was approved and would be executed by David and Lazaro, in early February Diego performed his obligations under paragraph 8 of the written settlement agreement, by executing documents as requested by Elizabeth for the transfer of certain properties in Argentina from Diego to Lazaro.  By letter dated February 26, 1987, upon their request Goldstein confirmed to David, Lazaro and Solin & Breindel certain information that had been set forth in Diego's letter dated February 12, 1987 to David and Lazaro, c/o Solin & Breindel.

24.  Thereafter, the written settlement agreement as executed by David and Lazaro was received by Julio, Berta and Diego; and upon the approval of the written settlement agreement

by all parties, Goldstein released the funds held in escrow to Townsville and the funds were distributed by Townsville to David and the other shareholders (as noted above, the payment to David was about $104,000).  By letter dated May 5, 1987 to Goldstein and Diego's counsel, Elizabeth confirmed in writing that a settlement agreement had been made with respect to the disputes involving Lazaro and David (referencing the "settlement agreement made in this case"), and she made a request with respect to the portion of the settlement agreement concerning future distributions from the Broadway Developers investment to Solange.

25.  As more particularly set forth below, the memorialization of the settlement shows that contrary to defendants' fraudulent allegations (1) David and his authorized representatives were well aware of Townsville and the role it played in connection with the funds invested by the Herbstein family members in Solange and payments made by Solange to Townsville for distribution to the investors, and (2) David and his authorized representatives were on notice of the amounts of the distributions from Solange to Townsville and the amounts of the payments to be made to David by Townsville in early 1987.  Yet neither David nor his representatives ever disputed the fact that the payments were received by David.

D.  Subsequent Payments

26.  During the period from November 1987 through 2003, additional payments on the remaining investment were made when due to David or (after his death) to his heirs for David's interest, including payments to the IRS as withholding taxes on David's interest (for taxes due as a foreign partner after Solange ceased to exist and its shareholders became partners in Diego Herbstein Associates), except that during the period from 1999 to 2003, the net amount due for David's interest (after payment of withholding taxes to the IRS) was withheld as a setoff (about $22,000) against the substantially higher amount due from defendants as a result

10

of their failure to account for the proceeds from the sale of certain property in Argentina.  The

total amount due for David's interest during the period from November 1987 through 2003

(including amounts paid to the IRS as withholding taxes) was approximately $85,000, which

was paid except for the amount withheld as a setoff.

E.  Defendants' Schemes Involving a Fraudulent Claim
    and the Fraudulent Conduct of a Civil Action

27.  In or about early 2004 defendants devised a scheme to defraud and to obtain

money and property from plaintiff by means of a fraudulent claim and the fraudulent conduct

of a civil action in the courts of the State of New York.  The gravamen of defendants' scheme

was fraudulently to claim that no payment had ever been made to David on his investment,

and fraudulently to allege that no report or accounting had ever been made to David with

respect to his investment.

28.  The first phase of defendants' scheme involved the commencement of a fraudulent

civil action.  In or about March 2004 Eduardo and Guillermo commenced a civil action in the

Supreme Court of the State of New York, County of New York,  entitled *Eduardo Herbstein*

*and Guillermo Herbstein v. Diego Herbstein*, Index No. 103943/04.  The gravamen of the

complaint was the fraudulent claim that Diego had failed and refused to make any payments

of the investment returns that were generated on David's investment and held for his benefit.

On or about March 14, 2004 the complaint was served by mail by depositing a copy thereof to

the custody of the U.S. Postal Service within New York State in a post-paid wrapper for

delivery to Diego's attorney, Leopold Kaplan (hereinafter "Kaplan"), at 250 West 57th Street,

New York, N.Y. 10107.  Eduardo and Guillermo caused this fraudulent complaint to be mailed

in furtherance of their scheme to defraud and to obtain money and property from Diego.

11

29.  On December 20, 2004 the court entered an order striking Diego's answer to the complaint due to the default of his attorney Kaplan in failing to appear at a conference on a motion to strike the answer for failure to provide certain discovery.

30.  The second phase of defendants' scheme involved their endeavor to exploit the default of the attorney Kaplan by submitting a fraudulent affidavit in support of the entry of a default judgment in the amount of several hundred thousand dollars.  In February 2005 counsel for Eduardo and Guillermo filed a note of issue seeking an inquest and assessment of damages.  In support of their application for the entry of a default judgment, Eduardo knowingly submitted an affidavit, sworn to on February 25, 2005 before a consular associate in Buenos Aires, Argentina, containing false and fraudulent statements that Diego had not returned to David either his original investment or any distributions thereon, that Diego had refused to report to David any information about the investments, and that Eduardo had personal knowledge of these facts and circumstances.  On or about March 29, 2005 this affidavit was served by mail by depositing a copy thereof to the custody of the U.S. Postal Service within New York State in a post-paid wrapper for delivery to Kaplan at his New York address.  Eduardo and Guillermo caused this fraudulent affidavit to be mailed in furtherance of their scheme to defraud and to obtain money and property from Diego.

31.  On August 9, 2005 a default judgment was entered against Diego, in favor of Eduardo and Guillermo, in the amount of $742,000 ($301,926 in distributions, plus interest computed from the early 1980's, plus costs).

32.  In the meantime, several months after Kaplan's default, Diego was belatedly advised by Kaplan that an order had been entered striking the answer to the complaint.  Diego also learned that Kaplan had suffered from severe medical problems during the period of the

12

default and continued to suffer from such problems.  Diego retained a new attorney, Bart

Eagle (hereinafter "Eagle"), who was substituted for Kaplan as counsel of record for Diego in

May 2005.  Eagle conducted an investigation of the facts and circumstances and then brought

a motion by order to show cause with supporting papers seeking to vacate the default

judgment and the order striking the answer.  As a result of inquiries made by Eagle, Goldstein

was able to locate in storage documents from the 1980's reflecting payments to David on his

investment, reports and accountings to David and his representatives with respect to David's

investment, and the settlement between the Herbstein family investors that was memorialized

in writing in 1987.  The papers submitted in support of the order to show cause included

affidavits from Goldstein and Diego.

33.    The third phase of defendants' scheme involved the submission of fraudulent

affidavits in opposition to the order to show cause in an endeavor to secure the substantial

default judgment.  Eduardo and Guillermo knowingly submitted affidavits, sworn to on

September 30, 1985 before a notary in Buenos Aires, Argentina, containing false and

fraudulent statements that: (1) Eduardo managed his father's money and investments and was

privy to all communications by and between David, Diego and all other parties involved in the

investments; (2) neither David, nor David's widow, nor Eduardo nor Guillermo ever received

any distributions on the investments; (3) David never received any distributions from

Townsville, including the Townsville check payable to David that was in the files located in

storage by Goldstein, and neither David nor Eduardo knew that Townsville existed; (4) David

never saw or executed the written settlement agreement, and Goldstein's statement that David

was represented by counsel is false; and (5) Eduardo and Guillermo had personal knowledge

of these facts and circumstances.  On or about October 6, 2005 the affidavits were served by

mail by depositing copies thereof to the custody of the U.S. Postal Service within New York State in a post-paid wrapper for delivery to Eagle at his New York address. Eduardo and Guillermo caused the fraudulent affidavits to be mailed in furtherance of their scheme to defraud and to obtain money and property from Diego.

34. As set forth above in paragraphs 11–17 (the reports and accounting of payments made to David as of November 1985), paragraphs 18–22 (the escrow account for Solange, distributions therefrom, and the additional payment to David from Townsville), and paragraphs 23-25 (the memorialization of the settlement of the Herbstein family investors' dispute), the documents located in storage by Goldstein belie defendants' fraudulent claim that David never received any payments on his investment, as well as their fraudulent allegation that David never received any report or accounting with respect to his investment.

35. In an effort to respond to Goldstein's documents, defendants concocted the additional fraudulent allegations that David was not represented by counsel in connection with the Herbstein family investors' disputes in the mid 1980's, and that neither David nor Eduardo were even aware of the existence of Townsville (according to Eduardo, he managed David's money and investments and was privy to all communications by and between David, Diego and all other parties involved in the investments). However, the documents show that these additional statements were also false and fraudulent: (1) Goldstein was informed in writing, signed by David and Lazaro, that the Argentine attorney Elizabeth was authorized to act on their behalf in connection with the Solange investment; (2) Goldstein was informed in writing that the New York law firm Solin & Breindel was retained to represent David and Lazaro in connection with the dispute; (3) Goldstein was authorized in writing, signed by David and Lazaro, to provide all Solange documents to Solin & Breindel; (4) Goldstein was authorized in

14

writing, signed by an attorney or counsel at Solin & Beindel (acting on behalf of Elizabeth, David and Lazaro), to distribute funds held in escrow by Goldstein for Solange to Solange and later to distribute funds held in escrow by Goldstein for Townsville to Townsville.

36.  As set forth in paragraphs 23–25 above, the documents show that a draft of the written settlement agreement was submitted to Solin & Breindel; that after minor language changes, a final written settlement agreement was distributed for review and signature; that the written settlement agreement was executed by Julio, Berta and Diego; that Solin & Breindel approved the written settlement agreement on behalf of David and Lazaro; and that Elizabeth also provided assurances that the written settlement agreement was approved and would be signed by David and Lazaro.  Thereafter, three family members who were professionals  (Diego, a neurologist; Diego's sister, a biology and English professor in Argentina; and Berta's son, a neurologist who practices in New Jersey) saw a copy of the written settlement agreement executed by David and Lazaro.

37.  The documents show that the Herbstein family investors and their counsel were well aware of the existence of Townsville; that in order to obtain tax advantages the investors' funds were loaned from Townsville to Solange for investments in the United States; and that funds available for distribution by Solange from the investments were paid to Townsville to reduce the indebtedness and then by Townsville to the shareholders.  The loans by and payments to Townsville are clearly described in the draft settlement agreement:

> Solange is indebted to Townsville, N.V. ... in the sum of $700,924.45 as of November 30, 1986.  This consists of $519,203 balance of principal and $181,721.45 interest ....
> ***
> Solange shall make the following payments out of the funds presently held in escrow referred to above:
> (i)    Townsville N.V. ("Townsville") $655,924.45

15

>                                          \*\*\*
>
> The additional sum received by Solange of $21,623.26 shall be
> paid by Solange to Townsville, as a further reduction of the
> indebtedness of Solange to Townsville, bringing the total paid to
> date against said indebtedness, to $677,547.71, of which
> $181,721.45 represents accrued interest and the balance of
> $495,826.26 on account of principal, leaving a current principal
> balance due to Townsville, N.V. of $23,376.74 .....
>
>                                          \*\*\*
>
> Any future funds received by Solange from Broadway (the sole
> remaining investment of Solange), shall be paid first to liquidate the
> remaining principal and interest on the indebtedness of Solange to
> Townsville ....

The attachment to the draft written agreement acknowledges the funds received by

Townsville, the credit to Solange by Townsville for the reduction against its outstanding

indebtedness ($677,547.71, leaving a principal balance of $23,376.74), and describes how the

funds will be distributed, including a payment of approximately $105,000 by Townsville to

David for his interest of 15.865%.

    38.  Townsville and its role in the investments are also clearly described in the final

written settlement agreement memorializing the oral agreement made in November 1986:

> Solange is indebted to Townsville, N.V. ... in the sum of
> $700,924.45 as of November 30, 1986.  This consists of a
> $519,203 balance of principal and $181,721.45 in interest as of
> said date ....
>
>                                          \*\*\*
>
> Solange shall make the following payments out of the funds
> presently held in escrow referred to above:
> i) Townsville                                    $655,924.45
>
>                                          \*\*\*
>
> The additional sum received by Solange in December, 1986 in the
> amount of $21,623.26 shall be paid by Solange to Townsville, as a
> further reduction of the indebtedness of Solange to Townsville,
> bringing the total paid to date against said indebtedness, to
> $677,547.71, of which $181,721.45 represents accrued interest
> and the balance of $495,826.26 on account of principal, leaving a
> current principal balance due to Townsville of $23,376.74 ....
>
>                                          \*\*\*

16

> Any future funds received by Solange from Broadway (the sole
> remaining investment of Solange), shall be paid first to liquidate the
> principal and interest on the indebtedness of Solange to
> Townsville....

39.  The letter dated February 12, 1987 from Diego to Lazaro and David, c/o Solin &

Breindel, further referenced the indebtedness from Solange to Townsville:

> The indebtedness of Solange to Townsville is $35,000 plus interest
> from December 1, 1986.  This amount differs from the amount of
> $23,376.74 set forth in paragraph 7 of the Settlement Agreement of
> November, 1986, in that of the $21,623.26 referred to in that
> paragraph as being an additional payment in reduction of the
> Townsville indebtedness only $10,000 is being paid to Townsville.
> Irving Starr, the accountant for Solange, has now completed the tax
> returns of Solange for the fiscal year ended November 30, 1986
> (copy annexed) and has determined that the sum of $19,790.43 ...
> is due for taxes for the year.  These taxes are being paid from the
> balance on hand in the Solange account (including the $11,623.26
> not paid over to Townsville).
>                                                    ***
> Please be aware that once the indebtedness to Townsville
> has been fully paid, all funds received will be subject, not only to
> corporate taxes, but also will be taxable to the individual
> shareholders ....

That letter in turn is referenced in the letters to Solin & Breindel dated February 13, 1987, the

letter to Goldstein dated February 25, 1987, and Goldstein's letter dated February 26, 1987 to

Lazaro and David, c/o Solin & Breindel, which also references the indebtedness from Solange

to Townsville.  Finally, counsel for Diego and counsel for David and Lazaro provided written

authorization to Goldstein to release $645,924.45 from his escrow accounts to Townsville.

40.  In sum, defendants knowingly made false and fraudulent statements, including the

assertion that David was not aware of the existence of Townsville and did not receive any

distribution from Townsville, in furtherance of their scheme to defraud and obtain money and

property from plaintiff.

41.   In April 2006 the court granted Diego's motion to vacate the default judgment and the prior inquest that resulted in the default judgment in the amount of $742,000, which was conducted on the basis of Eduardo's affidavit without notice to Diego's new counsel Eagle. The court denied the motion to vacate the order striking the answer to the complaint based on Kaplan's default, and gave leave to Eduardo and Guillermo to move for a default judgment on liability and an inquest on damages.

42.   In May 2006 Eduardo and Guillermo moved for a default judgment on liability and an inquest on damages.  Thereafter, Diego cross-moved for leave to renew and reargue the court's refusal to grant relief from Kaplan's default based on his illness.  In July 2006, in their papers submitted in opposition to the cross-motion, Eduardo and Guillermo cited and continued to rely on their prior fraudulent affidavits.  In September 2007, the court granted their motion for a default judgment on liability, denied Diego's cross-motion, and referred the matter to a referee for the purpose of conducting an inquest on damages.  The trial on damages is currently scheduled for January 22, 2008.

43.   For a period that has lasted 46 months to date and is continuing, defendants have pursued their fraudulent claim – that David did not receive any payments on his investment – in a civil action in state court and have fraudulently conducted the litigation, thereby causing Diego to incur substantial legal fees defending against the fraudulent claim and preventing and minimizing damages resulting from the fraudulent conduct of the state civil action.

COUNT ONE
(Civil RICO)

44.   Paragraphs 1 through 43 of this Complaint are hereby realleged and incorporated by reference.

18

45. At all times relevant hereto, defendants Eduardo Herbstein and Guillermo Herbstein constituted an enterprise within the meaning of 18 U.S.C. §1961(4), namely, a group of individuals associated in fact for a common purpose, which enterprise was engaged in and the activities of which affected foreign and interstate commerce. The purpose of this enterprise was to obtain money and property from plaintiff by making a fraudulent claim that David never received any payment on his investment and by the fraudulent conduct of the state court action. At all times relevant hereto, David Herbstein's ownership interest as a shareholder of Solange and his partnership interest as a partner of Diego Herbstein Associates also constituted an enterprise within the meaning of 18 U.S.C. §1961, which was engaged in and the activities of which affected foreign and interstate commerce.

46. Beginning sometime prior to March 2004 and continuing to date, within the Southern District of New York and elsewhere, defendants Eduardo Herbstein and Guillermo Herbstein, being associated with the above-mentioned enterprises, knowingly and wilfully conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), including the following predicate acts of mail fraud and wire fraud.

First Predicate Act (Mail and Wire Fraud)

47. Paragraphs 27 through 29 of this Complaint are hereby realleged and incorporated by reference.

48. Defendants Eduardo Herbstein and Guillermo Herbstein devised and participated in a scheme to defraud and to obtain money and property from plaintiff by means of a fraudulent claim that David never received any payments on his investment and the fraudulent conduct of a civil action alleging such claim against Diego in state court. The scheme included the

19

making of false and fraudulent statements in a complaint and affidavits filed in the state court action.

49.  Having devised this scheme to defraud, in or about March 2004 defendants caused the fraudulent complaint in the state civil action to be filed and caused the fraudulent complaint to be mailed by the Postal Service within the Southern District of New York for the purpose of executing the scheme in violation of 18 U.S.C. §1341.

50.  Having devised this scheme to defraud, in or about and between March 2004 and December 2004, defendants caused items relating to the complaint to be mailed by the Postal Service within the Southern District of New York, and caused various writings, signs, signals, pictures and sounds relating thereto to be transmitted by means of wire communication in foreign and interstate commerce, for the purpose of executing the scheme in violation of 18 U.S.C. §§1341 and 1343.

Second Predicate Act (Mail and Wire Fraud)

51.  Paragraphs 30 and 31 of this Complaint are hereby realleged and incorporated by reference.

52.  Having devised this scheme to defraud, on or about March 29, 2005 defendants caused Eduardo's fraudulent affidavit to be mailed by the Postal Service within the Southern District of New York for the purpose of executing the scheme in violation of 18 U.S.C. §1341.

53.  Having devised this scheme to defraud, in or about and between January 2005 and August 2005, defendants caused items relating to the affidavit to be mailed by the Postal Service within the Southern District of New York, and caused various writings, signs, signals, pictures and sounds relating thereto to be transmitted by means of wire communication in foreign and interstate commerce, for the purpose of executing the scheme in violation of 18

20

U.S.C. §§1341 and 1343.

Third Predicate Act (Mail and Wire Fraud)

54.  Paragraphs 32 through 41 of this Complaint are hereby realleged and incorporated by reference.

55.  Having devised this scheme to defraud, on or about October 6, 2005 defendants caused their fraudulent affidavits to be mailed by the Postal Service within the Southern District of New York for the purpose of executing the scheme in violation of 18 U.S.C. §1341.

56.  Having devised this scheme to defraud, in or about and between September 2005 and April 2006, defendants caused items relating to their affidavits to be mailed by the Postal Service within the Southern District of New York, and caused various writings, signs, signals, pictures and sounds relating thereto to be transmitted by means of wire communication in foreign and interstate commerce, for the purpose of executing the scheme in violation of 18 U.S.C. §§1341 and 1343.

Fourth Predicate Act (Mail and Wire Fraud)

57.  Paragraphs 42 and 43 of this Complaint are hereby realleged and incorporated by reference.

58. Having devised this scheme to defraud, in or about and between May and July 2006 and continuing to date, defendants caused items relating to their fraudulent claim and fraudulent affidavits to be mailed by the Postal Service within the Southern District of New York, and caused various writings, signs, signals, pictures and sounds relating thereto to be transmitted by means of wire communication in foreign and interstate commerce, for the purpose of executing the scheme in violation of 18 U.S.C. §§1341 and 1343.

RICO Injury

59.  By reason of defendants' fraudulent conduct in violation of 18 U.S.C. §1962(c),

plaintiff has incurred a substantial amount of attorneys' fees and expenses defending against

the fraudulent claim and in preventing and minimizing damages from the fraudulent conduct of

the state civil action.  The amount of such attorneys' fees and expenses incurred to date

exceeds $150,000, and plaintiff is continuing to incur additional attorneys' fees and expenses

as defendants continue to pursue their fraudulent claim.  As a result, plaintiff has been injured

and deprived of property in an amount to be determined at trial, and seeks treble damages

against defendants jointly and severally pursuant to 18 U.S.C. §1964(c), together with costs

and attorneys' fees of this action.

COUNT TWO
(Civil RICO Conspiracy)

60.  Paragraphs 1 through 43 of this Complaint are hereby realleged and incorporated

by reference.

61.  At all times relevant hereto, defendants Eduardo Herbstein and Guillermo

Herbstein constituted an enterprise within the meaning of 18 U.S.C. §1961(4), namely, a

group of individuals associated in fact for a common purpose, which enterprise was engaged

in and the activities of which affected foreign and interstate commerce.  The purpose of this

enterprise was to obtain money and property from plaintiff by making a fraudulent claim that

David never received any payment on his investment and by the fraudulent conduct of the

state court action.  At all times relevant hereto, David Herbstein's ownership interest as a

shareholder of Solange and his partnership interest as a partner of Diego Herbstein

Associates also constituted an enterprise within the meaning of 18 U.S.C. §1961, which was

engaged in and the activities of which affected foreign and interstate commerce.

62.   Beginning sometime prior to March 2004 and continuing to date, within the Southern District of New York and elsewhere, defendants Eduardo Herbstein and Guillermo Herbstein, being associated with the above-mentioned enterprises, knowingly and wilfully conspired to violate Title 18, United States Code, Section 1962(c), that is, they conspired to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering activity in violation of Title 18, United States Code, Section 1962(d).  Defendants conspired to violate 18 U.S.C. §1962(c) by agreeing to commit and committing the predicate acts of mail fraud and wire fraud as alleged against each defendant in Count One of this Complaint and by embracing and adopting the objects of the RICO conspiracy and the goal of facilitating and furthering it.

63.   By reason of this conspiracy and the predicate acts committed in furtherance thereof, plaintiff has incurred a substantial amount of attorneys' fees and expenses defending against the fraudulent claim and in preventing and minimizing damages from the fraudulent conduct of the state civil action.  The amount of such attorneys' fees and expenses incurred to date exceeds $150,000, and plaintiff is continuing to incur additional attorneys' fees and expenses as defendants continue to pursue their fraudulent claim.  As a result, plaintiff has been injured and deprived of property in an amount to be determined at trial, and seeks treble damages against defendants jointly and severally pursuant to 18 U.S.C. §1964(c), together with costs and attorneys' fees of this action.

COUNT THREE
(Common Law Fraud)

64.   Paragraphs 1 through 43 of this Complaint are hereby realleged and incorporated

by reference.

65.  Defendants Eduardo Herbstein and Guillermo Herbstein devised a scheme to defraud involving the making of a fraudulent claim that David never received any payments on his investment and the fraudulent conduct of a civil action alleging such claim against Diego in state court.  In furtherance of this scheme, defendants knowingly and intentionally made a fraudulent claim in their state court complaint, and knowingly and intentionally made false and fraudulent statements in their affidavits submitted as part of the fraudulent conduct of the state civil action.  Defendants knew that the aforesaid claim and statements were untrue and fraudulent, intended that the state court rely on said claim and statements in the state court action to Diego's detriment, and acted with intent to defraud the state court and Diego.

66.  The state court relied on defendants' false and fraudulent statements in connection with the entry of a default judgment against Diego, in favor of defendants, in the amount of $742,000.  Thereafter, upon Diego's motion brought by his new attorney Eagle, the state court vacated the default judgment in said amount.  The state court relied on defendants' false and fraudulent statements as raising triable issues of fact on the subject matter of damages arising from David's investment.  Without resolving the disputed issues of fact raised by defendants' affidavits and the affidavits of Diego and Goldstein, the state court referred the matter to a referee for an inquest to resolve disputed issues on the subject matter of damages alleged by defendants in their state court action.  Defendants' false and fraudulent statements constituted a fraud on both the state court and Diego.  Although Diego was not deceived in the sense of believing defendants' false and fraudulent statements to be true, Diego relied on said statements as necessitating him to incur substantial attorneys' fees and expenses to defend against the fraud, to set aside the default judgment in the amount of $742,000 obtained by

24

fraud, and to prevent and minimize damages from the fraud.

66.  By reason of defendants' fraudulent conduct, plaintiff has incurred a substantial amount of attorneys' fees and expenses defending against the fraudulent claim and in preventing and minimizing damages from the fraudulent conduct of the state civil action.  The amount of such attorneys' fees and expenses incurred to date exceeds $150,000, and plaintiff is continuing to incur additional attorneys' fees and expenses as defendants continue to pursue their fraudulent claim.  As a result, plaintiff has been damaged in an amount in excess of $150,000 to be determined at trial.  In addition, plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

WHEREFORE, plaintiff Diego J. Herbstein demands judgment against defendants on the RICO claims for treble the amount of damages plaintiff has suffered, which amount is in excess of $150,000 and will be determined at trial, plus costs and attorneys' fees of this action; and plaintiff demands judgment on the common law fraud claim in an amount in excess of $150,000 to be determined at trial, plus punitive damages and the costs of this action.

Dated: New York, New York
        January 21, 2008

_____/s/_____
Ronald E. DePetris (RD-8117)
For the Firm of
DePetris & Bachrach, LLP
Attorneys for Plaintiff Diego J. Herbstein
240 Madison Avenue
New York, New York 10016
(212) 557-7747

Exhibit A

GOLDSTEIN & ZUCKER

## MEMORANDUM

FROM:  JAMES A. GOLDSTEIN

TO:  LAZARO FREIDENBERG
     DAVID HERBSTEIN
     JULIO HERBSTEIN

Re:  U.S. Investments

Date:  11/22/85

I met with Elizabeth Freidenberg regarding certain questions she had about Diego's handling of your funds in the U.S.  In going over these questions with Diego, he set forth the following facts regarding your investments which I personally felt was worth putting in the the form of this memorandum together with my own recommendation.

FORMATION OF INVESTMENT COMPANIES.

On or about October 31, 1977, Great Southern Investment (GSI) was formed with a total capital of $455,000.  The shareholders were as follows:

| NAME | Interest | Contribution |
|------|----------|--------------|
| Julio Herbstein (JH) | 32.8% | $149,240 |
| Lazaro Freidenberg (LF) | 38.5% | $175,175 |
| David Herbstein (DH) | 28.7% | $130,585 |

Shortly thereafter, Great Southern Realty (GSR) was formed with the same shareholders plus Salomon Lijtmaer (SL).  SL invested money so that he had a 5% interest in GSR.  The money for your interests in GSR came from GSI. You never put any other moneys under Diego's control with regard to the investments handled under the corporate headings of GSI, GSR or Solange Realty.

The percentage interests in GSR, when it was initially formed, were as follows:

| | |
|----|--------|
| JH | 31.160% |
| DH | 27.265% |
| LF | 36.575% |
| SL | 5.000% |

CHANGE IN DH & JH INTERESTS.

In Spring of 1979, DH's children indicated to Diego that DH would like to take his money from the United States back to B.A. However, at JH's insistence, part of the money was kept in the

**0000015**

GOLDSTEIN & ZUCKER

U.S. as a reserve for DH in the event of adverse economic conditions in Argentina. In July 1979, the value of the total investments in GSI and GSR was calculated to be $1,000,000, an increase of over 100% in less than two years. The sum of $120,000 was transferred to DH and his 28.7% interest in the GSI and 27.265% interest in the GSR investments was reduced to 16.7% and 15.865%, respectively. JH provided the funds used to pay off DH. This increased JH's interest in all the investments.

The percentage interests subsequent to the payment by JH of $120,000 to DH on 7/79, were as follows:

|     | GSI    | GSR     |
|-----|--------|---------|
| JH  | 44.8%  | 42.560% |
| DH  | 16.7%  | 15.865% |
| LF  | 38.5%  | 36.575% |
| SL  | ----   | 5.000%  |

FORMATION OF SOLANGE.

On or about September 1981, Solange Realty Corp. was formed to serve as a vehicle for certain real estate investments in the United States, particularly those where partnership interests were purchased. No new money was put in Solange by you; however, moneys were transferred from GSI and GSR. Therefore, the percentage interests of Solange have always been as follows:

| JH | 42.56%  |
|----|---------|
| DH | 15.865% |
| LF | 36.575% |
| SL | 5.0%    |

DISSOLUTION OF GROUP.

Subsequently, on or about March 1984, DH and LF indicated that they wanted to withdraw their funds from Diego's management. Therefore, all investments have either been liquidated or the interests of LF and DH have been purchased by JH, with the one exception of the investment in the property known as 2420 Broadway made through Diego Herbstein Associates. As a result, payments have been made as indicated below:

| DH   |             | LF   |             |
|------|-------------|------|-------------|
| 4/84 | $70,588.56  | 4/84 | $162,734.11 |
| 6/84 | 7,843.16    | 6/84 | 65,826.00   |
| 6/84 | 28,548.00   | 2/85 | 81,831.21   |
| 2/85 | 27,229.26   | 3/85 | 27,065.50   |
| 3/85 | 11,740.10   |      | $337,456.82 |
|      | $145,949.08 |      |             |

-2-

0000015-A

GOLDSTEIN & ZUCKER

## MINOR PRIOR DISTRIBUTIONS.

In addition to the above distributions, some time prior to March 1984, Mrs. Freidenberg wanted to get some cash for her use in Argentina. It was decided that a distribution of approximately $30,000 a year would be made to all shareholders, pro rata, in accordance with their percentages. Moneys were paid in Argentina by JH to LF to cover the LF percentage distribution each year. Diego transferred moneys to DH's account each year to cover his percentage interest, and transferred moneys to his father's account to cover the JH interest and to reimburse JH for the money he advanced in Argentina for LF.

## REMAINING INVESTMENT IN BROADWAY.

The only remaining investment still shared by the group is its investment in Broadway through Diego Herbstein Associates in which it originally invested $446,331.21. The full sum was never paid because Solange (unlike the other Diego Herbstein Associates partners) was allowed to assume part of a mortgage. This mortgage was paid off when Broadway made its first distribution. In September 1983, Solange received $172,772 as its share of that distribution.

The property has just been converted to cooperative status. In accordance with my agreement with Diego and understanding with Elizabeth, I have invested Solange's distribution of $284,735.53 in a separate escrow money market account at Citibank currently paying approximately 7.25%. In this connection, see my letter to Diego of November 7, 1985 (copy attached) and the memo sent to all partners of Diego Herbstein Associates (copy attached).

I believe that an additional distribution of approximately $200,000 will be made for Solange's account before the end of the year. Thereafter, over a long period of time, I expect additional sums totalling at least $500,000 will be payable to Solange. However, all moneys received as a result of Solange's investment in 2420 Broadway, through Diego Herbstein Associates, is subject to a commission agreement which I made with Diego many years ago.

## COMMISSIONS.

Prior to the formation of GSI, it was agreed by all parties that Diego would be paid or provided with a commission of 10% of all profits realized by the parties as a result of their investments under his control. All sums to be paid out over and above the original $455,000 investment should be subject to the 10% commission. This was agreed to by all the partners, including SL, who came in later.

-3-

0000015-B

GOLDSTEIN & ZUCKER

A 10% commission was provided for with respect to the LF distribution made in April 1984. However, DH's children indicated they did not wish to pay the commission and thus far Diego has not taken any commission on account of the DH interests. However, he intends to do so.

QUESTIONED TRANSACTIONS.

When I first sat down with Elizabeth Freidenberg on November 9, 1985, she had some further questions regarding certain transactions. Specifically, she pointed to a check dated August 9, 1979, for $12,000 written on her parent's account to N.Y. Neurological Associates, a corporation partially owned and controlled by Diego. Although this has nothing to do with the above, I point out that I asked Diego about it and he indicated it was a loan made to the corporation with the consent of the Freidenbergs and which was repaid with interest in accordance with a spreadsheet that I provided to Elizabeth.

Elizabeth also questioned a $70,000 payment from Great Southern Realty to Diego's cousin, Jorge Krell. Elizabeth said this money was supposed to have been returned to the corporations and she saw no indication of the return. I asked Diego about this and he provided bank statements, which I showed to Elizabeth, clearly indicating the return of those funds.

She questioned certain other transactions which Diego explained, but he had no written back-up for his explanations.

Without being privy to all the various transactions and the underlying reasons for many of them, I was under the impression that these funds were taken out of Argentina and invested in the U.S. under circumstances which may or may not in all cases have been in accordance with Argentine law. Many of the transactions were carried on through a Panamanian corporation (GSI) and others through a Curacao corporation (GSR). Diego has advised me that for various reasons nobody was interested that detailed records be kept of the various transfers, transactions and investments. But everyone was interested in the profits that Diego was supposed to make.

From the very beginning, LF requested Diego not to discuss his handling of these funds with any of his daughters. Every year during one of his visits to New York or on Diego's visits to Argentina (usually in Uruguay), Diego reviewed all the accounts and investments with him and they both signed a balance sheet indicating their agreement to the balances.

GOLDSTEIN & ZUCKER

RECOMMENDATIONS.

Many questions have been asked of Diego, both directly and through my office, and Diego has been willing to answer them, but has been unable to answer many because he does not recollect the answers and does not have records to refresh his recollection. All these problems arose simultaneous with the unhappy marital situation between Diego and Judy, I personally believe Diego's reactions to the questions now put to him and Elizabeth's to the answers, result more from emotionalism than from sound business judgment.

It is my own recommendation that, in the light of the profits made and in light of the failure to show once again with the most recent questions that Diego has, in fact, been guilty of any misappropriation of funds, that the time has come to exchange releases and settle and resolve all outstanding matters and get on to a proper procedure for the final payments to be received from Solange.

0000015-D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIEGO J. HERBSTEIN,

Plaintiff,

-against-

EDUARDO HERBSTEIN and
GUILLERMO HERBSTEIN,

Defendants.

COMPLAINT

DePETRIS & BACHRACH, LLP

ATTORNEYS FOR PLAINTIFF

240 MADISON AVENUE, NEW YORK, N. Y. 10016

(212) 557-7747